Mr. Whitaker's ability to defend against the death penalty in this case depended upon showing that his relationship with his father had mended. This depended critically on his defense against the death penalty depended critically on showing that he was no longer manipulating his father, that he was no longer scheming against his family. As the court may know, this was a familicide in which the mother and son of the father were killed. We have raised two claims on appeal that have to do with prosecutorial misconduct in the first place and an IAC claim. I'm going to address the prosecutorial misconduct claim first. What happened in this case, I believe, is something that is shocking to the conscience. The prosecutor anticipated what the defense to the death penalty was going to be. He says in a pretrial affidavit that he realized that the defense in this case was going to be that Kent Whitaker, the father, had forgiven the son, that their relationship had mended, and that there was no longer going to be a danger coming from Mr. Whitaker. The reason for this is because his history, although it had included a burglary, did not include as much as a dust-up in the schoolyard. There is no violent actions against human beings. You said a burglary? I thought there were multiple burglaries. There was a break-in as a juvenile into a school. Some computers were taken. It was essentially a prank. All right, so it was just the one time. That's my understanding. That was the one time. There wasn't multiple burglaries, and there wasn't anyone endangered. It was done as a kid, and he didn't have a history of beating up people, of knifing people, of doing anything that was violent, and not even mention in the record of him having a brawl in the backyard with his sibling. Planning two other times to kill his family. Yes, correct. That is the case. Let me get to why this, I think, is a situation in which there was a violation of clearly established Supreme Court law. It is so shocking that virtually any case that mentions fundamental fairness, any case that mentions shocking to the conscious, applies. You say it's shocking to the conscious. I just want to walk through how this was first injected into the trial. Let me first ask. The proffer was written by the attorney, I think Mr. Ardoin. Am I correct in that? Mr. Ardoin, who was working with Dan Cogdell. One of the defense attorneys. So it wasn't a statement of the defendant, of Mr. Whitaker. Is that correct? It was a statement of Mr. Whitaker, his account of the facts, given to his attorney. So it was like an attorney proffer in the federal system. Exactly. But so it's not, it's the attorney saying, here's what my client would say. Correct. Okay. And it's first brought into the case, as best I can tell, when the father testifies during the guilt stage and the prosecutor says, and your son never confessed, right? That is correct. Don't you think the prosecutor expected or wanted the answer to be, yes, that's true, he never confessed? Exactly. That's exactly what he wanted him to say. Okay. But the father instead, instead of saying, yes, you're right, he never confessed. Oh, I'm sorry about that. Which, as I read it, is accurate. He didn't never confess. The father, because he wants to push back on that, he doesn't want his son to look like he's not remorseful, says, well, maybe he didn't confess, but there was this proffer. Is that the first time this gets mentioned in the trial? That's correct. But let me back up to see how this proffer was first obtained. Well, and back up a little bit because you had begun to talk about a violation of clearly established Supreme Court law. That is correct. If you could just tell me very succinctly what the clearly established Supreme Court law is that was violated. Well, we've identified several lines in the appellate brief. I believe that the closest is Mincie v. Arizona. It's a case about involuntary confessions, and the holding in that case was any use of an involuntary confession violates due process. That's Lissenbaugh v. I believe the United States as well. So those, I think, are the closest cases that we've cited in the appellate brief that establishes a clear rule. But if I may, the proffer was procured because there was negotiations over a life sentence. So you're not arguing that it was a confession? I thought your argument was it was part of a plea negotiation. Yes, it certainly was. How does a confession case help you? Because I believe that a proffer is a confession when it describes the defendant's role in the crime. It says that, though my understanding is proffers, as was argued on direct evidence here under both the state of Texas evidentiary rules and the federal evidentiary rules, proffers, because they're part of plea negotiations, are not admissible, whereas a confession, of course, is. So why are you assuming this is a confession both in your argument that it was an involuntary confession, thus violative of due process, and in your argument that the prosecutor, by asking whether there was a confession, somehow meant to bring up this proffer, which under the rules is ordinarily not discussed in a trial? Yes, and that's one of the reasons that makes this case egregious. In fact, if I just may set the stage for it, the prosecutor directed the defense attorneys to omit any expressions of remorse and contrition from that statement. That is the central point. He manufactured the evidence that he was going to then use at trial to impeach both Kent and Mr. Whitaker, Thomas, and he anticipated this. When Kent took the stand, he asked him, was there, did he confess, and he said, I think he did. And then we have this histrionics by the prosecutor in front of the jury in which he says he didn't assume liability. This is meaningless as far as his criminal liability goes. You know that, don't you, referring, of course, to the fact that it was protected under 410. Is it significant that there was no contemporaneous objection to these histrionics? Not for the purposes of the appeal in this case. It would be if we were appealing the ineffectiveness of counsel, but it has on that ground, and we are not. What is important is that there was a change of counsel. Cogdell and Ardoin were prior counsel. Mr. Randy McDonald, now Judge McDonald, was the trial attorney, and he did not know about the proffer. So he was essentially sandbagged by Mr. Felkman, the prosecutor, the trial attorney, Randy McDonald. He didn't see this coming. He didn't know how it originated. And it was used to show explicitly that Bart no longer had any remorse. That was the statement that came across through the cross-examination of both Kent and Bart Whitaker. And it was also used by the prosecutor to argue before the jury that he was manipulating his attorneys. Your factual statement that McDonald was sandbagged, that's not in his affidavit. He wrote a 12-page, single-spaced affidavit. He doesn't claim it. In fact, at the guilt phase, I thought he tells the jury in the end, you've seen the proffer. He didn't sign it. So how can you be saying he was sandbagged and didn't know about the proffer? Because in his closing argument, he says someone, somewhere, somewhere in this case was getting a statement made. I don't know who it was. I don't know who with his prior attorney's office was doing this. It's evident from his closing argument. He had no idea that this was coming and had no idea that this proffer was out there and was going to be used by the prosecutor in this case. I thought his final question to the father, Kent, at the punishment phase was, isn't it true he's tried to plead guilty since his day of arrest? Yes. There were attempts for him to plead guilty. And then he explicitly mentions Cogdill. He mentions the predecessor counsel saying we've all, the whole mitigation case was this man's been trying to plead. Even his father and the uncle wanted life. It's the government that won't take it. The shooter didn't get it. The Texas Court of Criminal Appeals said this was straight up presented. It was essential to the mitigation case. And I think that, for one thing, isn't part of this appeal, and, two, I think it's absolutely wrong. It was not presented by the defense. The proffer wasn't. It was not presented by – And, in fact, both Mr. Whitaker says, and I'm talking about Thomas when he's cross-examined, says, I wouldn't agree to this. He's there twisting in the wind because the prosecutor is asking him about why is there no expressions of remorse and confession in this? Isn't this completely offensive? Given what your father has done, come to me and plead for your life sincerely. You are manipulating the father. You're manipulating your attorneys. But it was Mr. Feldman who manipulated both the attorneys by getting them to provide him a proffer without any signs of contrition or remorse in it, and it was also Mr. Whitaker that was manipulating, I believe, Kent as well by calling him to the stand for a specific purpose of introducing this argument. And it's evident from his post-trial affidavit that he had realized how important it was to demonstrate to the jury that Mr. Whitaker, that is the petitioner, was not sincerely repentant, that he was using his father to try to get a life sentence, and that he posed a danger therefore. He was capable of manipulating his attorneys, and it was all manufactured by this ruse of getting a statement that he knew was not covered by 410, getting a statement tailored to his specifications, and then using him properly at trial. But your whole theory of the shock, the conscious prosecutorial misconduct, according to you, is that the prosecutor, with some remarkable clairvoyance, says, well, I'm going to trick them into giving this proffer that's actually not remorseful. Then at trial I'm going to ask the dad, has your son ever confessed? And instead of saying yes, which I think is the answer the prosecutor would have expected and wanted, he's going to say, well, no, he actually did confess in this proffer. That's going to inject the proffer into this case. And then, boy, I can rebut that by saying, yeah, but that proffer wasn't remorseful. I mean that's so many steps. Well, Your Honor, perhaps the first step is debatable whether he had planned this from the start. But I certainly, by the time of trial, I believe the evidence shows this scheme was conceived. But you agree if the father had just said you're right, he never confessed, but we try. We ask not for the death penalty and all this other stuff. Then the issue probably would have never come up again about the proffer probably never would have been discussed in the trial, which is consistent with what the state rules of evidence provide, that a proffer is a plea negotiation discussion is not admissible. That's correct. So why is it the prosecutor's fault that the rather than agree with his leading question, the father says, well, maybe he didn't confess, but, boy, there was this proffer he tried to do. Why can you put it on the prosecutor that the father decides to inject the proffer into the case? Well, the – why in this case didn't the prosecutor just stop and say, yes, there was a proffer? That would be – you're correct about that. And go on to another line of questioning. That's not what he did. He went and used the proffer and what he had asked the attorneys to omit from the proffer, to impeach both Kent and to impeach Bart at the punishment phase. So it was manufactured evidence. To me, the analysis would be very different guilt and punishment because the conclusion that the CCA came to, which Judge Ellison adopted, was that the punishment phase, the entire mitigation defense from the first moment, using the father as elicited from the defendant was we entered plea negotiations with the government from day one. And so then the government responsibly, appropriately under 410, can say, well, no, you didn't confess, and can use the proffer the way that they did, battling with the defendant. Well, for one thing, he wasn't battling with the defendant of guilt and innocence. He was – No, I'm talking about the punishment phase when Bart's on the stand and the most extensive discussion of the proffer comes up. Yeah. Well, at that point, Mr. Whitaker, that is, Bart, isn't saying that, no, I was confessing at that point. He said I didn't write that. Right. I don't understand the way it was being used. So if the jury hears he didn't write it – Yes. – and that's consistent. They heard that from McDonald. They heard that from him. And then the jury actually is never even given the proffer, so it's not in evidence. How is it that you can infer that they concluded that what they never saw and what no witness said to them didn't contain remorse? The prosecutor is making those statements to the jury. There were attorney statements that were made. Yes. But the jury was informed that the attorney statements don't carry any weight. So what they heard from was the father and the son, who both were in agreement that the defendant didn't sign or approve it. Then the jury at no point ever gets it. In fact, it's still not in this record. So the CCA in the 2009 direct appeal says this is harmless under any possible analysis, but once we get to the punishment phase, it's not just not harmless, it's appropriate responsive use because the defense case turned vitally on his assertion that he tried to plead. So then the government says to him, well, you didn't plead. In fact, you went to trial, and that's when they had the little scuffle over the not guilty plea. Yes, I agree with that. Did the jury ever send a question and ask to see the proffer? There was not a—no, Your Honor, there was not, and it wasn't in— And this is a jury that did send some questions and ask to see some things. Isn't that right? Didn't they ask to read some witness—to see or hear some witness testimony or reread it, something like that in this case? That's correct. They never ask anything about it? It wasn't introduced into evidence. But they never ask anything about this proffer? That's correct. All right. That's correct. So moving on to the IAC case. Well, before you do, Judge Graves asked you for the most appropriate case, and if we conclude this isn't an involuntary confession because it was his unilateral submission to the government, you argued to Sanibello, you argued Giglio and Napu. Do you have any circuit case? Because as I understand the proposition, this is a queen for the day type attorney proffer. There's nothing wrong with limiting scope, right? When the prosecutor says to the defense counsel, you, attorney, give me a proffer of just the facts, they're not asking for and is he remorseful today or not. So I don't offhand see any law that would say a limited scope proffer would be bad. It's got to be how it was used. Correct. So what circuit case do you have that establishes there's a due process violation when you ask a defendant who submitted a proffer a question that the defendant thinks was beyond what the scope of the proffer requested? Do you have any case remotely factually? The cases that are closest factually and enunciate a principle that I think is clear and applicable are the involuntary confession cases. How is it an involuntary confession if you unilaterally give the government something? That's your voluntary saying, consider this before you assess if death is appropriate. What case says that's an involuntary confession? You offered it to them. You offered to them under 410. Right. And then it was used at trial. And then 410 is what the Court of Criminal Appeals already said was appropriately resolved. At the penalty phase it was responsive. At the guilt phase it was harmless. It comes up with one witness and doesn't come up in closing. It did resolve the 410 issue that way. The point was that it was obtained from the attorney under the belief that it would not be introduced, would not be used at trial. That is the point. And it wouldn't be given if they were going to certainly if it was known that he was going to use it in the way that he did, which is to focus on the omissions, to focus on the lack of contrition that he directed them not to put in it. And we know that this dismay about the lack of contrition was feigned because at the motion for a new trial this proffer comes up and the prosecutor says, you know, I was very pleased with what Mr. O'Dwan did. He worded it very, very carefully. There was nothing offensive in it at all. In other words, it was drawn up to my specifications. But at trial he said he put on a dramatic presentation which was completely misleading and false, and it went to the heart of the defense. It made statements. He is manipulating his attorney. He is inseer in not taking responsibility. When the key to the defense against the death penalty was that he had taken responsibility, he had mended his relationship with his father, that he has now posed a danger to nobody else, not including his father. At the family phase, did the government, it doesn't come up in the rebuttal argument by Felkman, correct? Pardon me? The proffer doesn't come up in any way at the rebuttal argument by the State, Mr. Felkman. It comes up by Mr. Strange. Yes, that's correct. Can you quote for me or cite the record page where he characterizes the proffer as something that doesn't contain remorse? Let's see. I cannot give you the sign, but it would be his examination of King Whittaker and his cross-examination of Barnt Whittaker, both of those. But Mr. Strange's use of it at the penalty phase closing was to say what? That's all right. Go ahead with your ineffectiveness. It's quoted in the brief, but I believe it was that Anne quoted also in the opinion. And the thrust was that this was manipulation on Bard's part, that he was manipulating his attorneys. That he has his story about not knowing anything about how this was created, but it's really his scheme to try to avoid the death penalty when it was the prosecutor's scheme. But there's never in that statement – my point is the prosecutor doesn't make the misimpression you say he did in that he never says and he didn't convey remorse. He just makes the observation that you were talking to your lawyers and they drafted something you now want to disavow. You say you had one in your jail cell. But there's nothing untrue about that. The lawyer submitted something that the defendant didn't sign or approve. And so all that Strange says is, well, here again he's blaming lawyers. Strange to my reading never said he left out remorse. He never capitalized on what you say is the misimpression. Well, there's two. There's one that he left out remorse, and two that he was manipulating his attorneys, which wasn't what he was doing. Okay. Right? And that of course – One more question on the misconduct. Judge Ellison found – the whole factual premise is it starts with this meeting at a store, right, with Cogdell and Ardoin and the prosecutor. And Judge Ellison said, well, he says there's no state court factual finding that I'm bound by. So it's summary judgment for purposes of summary judgment. I'm going to credit the plaintiff's story, your client's story, and go with what Ardoin and Cogdell say about whether the prosecutor said, oh, don't include remorse. But the state court did say they credited in full Felkman's affidavit. And that – Felkman doesn't characterize it that way. So why aren't we bound by the state court saying they accepted Felkman's affidavit as true? Or at least that creates the presumption that has to be overcome, which is different than how Judge Ellison treated it. Well, there's two reasons for that. Both we have absolutely opposed affidavits, one of Cogdell and Ardoin's and Felkman's. And Felkman's the state credited. Right. But there was no way to resolve those in any sort of reasonable way without having an evidentiary hearing and determining who was telling the truth here. The other thing is that the Felkman affidavit is essentially an editorial, a rant in which the – there aren't factual statements in it that are true. I think he uses terms like – But my point is the state court said it's true, so why aren't we in the world – it can be overcome, but where deference is given to – Ellison said there was no factual finding in the state court on what was said at the store. But my question to you, isn't the state court saying Felkman, we believe, is truthful? Doesn't that cover that? Maybe you can show that it overcomes the presumption. What was – there are certain things in that affidavit that are absolutely false. This should be in Andrew's brief. Was he being truthful? That's not what Judge Ellison said. He just said it's not – there's nothing on point in the state court finding, so I can look at it as a blank issue. Isn't that how he dealt with it? Right. So, I mean, I think what it means it was – okay, this is credible, but what was credible in that affidavit? We really don't know. It was just sort of – he wasn't being blatantly dishonest is what that conclusion seems to say to me. Not any particular facts being found. And, in fact, it's contradicted by what they did. Finding of fact 83 has to do with the actual procurement of the proffer and the circumstances. And it says nothing about that. As Judge Ellison said, I can't tell what was found either implied or directly by this court, which brings up, I think, a threshold issue. If that's the case, then the operative facts of this claim, the most important facts of this claim, which have to do with the origin of that proffer and how it was procured, weren't ruled on by that court. And, therefore, this court is not bound by 2254D1 because it didn't reach the merits of the claim. It didn't reach the operative facts. Your time has expired. Thank you, Your Honor. All right. Thank you. Mr. Frederick. Thank you, Judge Graves, and may it please the Court. The prosecution's response to the defendant's theory of punishment was not, we've got you on paper in a proffer admitting that you have no remorse. Their response was, you say that all you've been trying to do is to come clean, take responsibility, and accept punishment. But you've never done that. What Felkman says over and over is, true remorse is, I did it, I'll take whatever the jury gets me. And we can disagree if that's what true remorse is, but that was his theory. And when you look at the specific statements regarding the proffer by Felkman, both in the guilt phase and the punishment phase, he is not emphasizing the substance of the proffer. In fact, when he discusses it in the punishment phase, it's ambiguous what he's even talking about. Well, he says, this is insulting to me because you weren't remorseful. Your father was begging for your life. That's pretty much the theory that the defense is suggesting. And in cross examination of the defendant, Mr. Felkman said, so you're a sociopath. You manipulate people like tools. He did absolutely say that. But that is not based on the proffer. That is based on the great body of evidence other than the proffer that the prosecution relied on, which was that even before he was arrested, after two of his family members were dead, he was out attempting to bribe Adam Hipp to lie for him. My read of the record is there was manipulation. The Hipp, the phone call that the jury heard fleeing to Mexico, there was a great deal. But there were several points that Felkman instead tried to have the jury get the impression that legal rules available to the defendant were manipulated. So if you remember in the record, Felkman tries to say, cross examine the defendant on his not guilty plea until the district judge, the trial judge, interrupts and sustains the objection saying he can not enter a plea. Well, then he comes into the proffer point and he gets the defendant to say, I didn't write it, but there is that histrionic moment where Felkman is saying, therefore, your father is begging and in tears and you're showing me no repentance. That is a fair general statement, but the problem with their theory is that there is only the most tenuous connection at best to the actual substance of the proffer. No question Felkman thought you haven't repented, you're manipulative, you're just trying to weasel your way out of the death penalty. No dispute about that. The question, though, is, is this a harmlessness argument or is this arguing that it was appropriate, responsive at the penalty phase? What's your argument? To answer that question, I have to back up a little bit and start with what the question before the court is. The court of criminal appeals ruled against him on the merits on his due process claim. So the questions are, under AEDPA, what is the clearly established law and has he proven that the court of criminal appeals' rejection of his claim, the result, was either contrary to that or reflects an unreasonable application? So the problem that I have in answering your question is, in order to say whether it's a harmlessness argument, I have to know what the clearly established law is. Now— Well, I guess his version of it is you can't tell a defendant, write me a proffer, but leave out something and then cross-examine the defendant for the portion that he left out. Now, he may not immediately articulate a case, but that, I don't think the government would dispute that a prosecutor can't tell someone at the onset, write me something, and then turn around and cross-examine him for not putting that in. I am certainly not here to say that that is a great thing for prosecutors to do. I don't know. I'm not a prosecutor. I hesitate very much to judge that. Not what I would do, probably. But the question is, it's not—the problem with their argument is they want to focus solely on one minor bit of conduct, say that it shocks the conscious, and not talk about EDBA. But I have to start with EDBA. That's the question, and the court has to start with EDBA. And on the harmlessness point, one of the arguments that he makes is, okay, here's another line of precedent. It's Brady, Giglio. It's the misrepresentation of evidence, falsification. Under that line of cases, even if it applies, which we certainly don't concede that it does, if that were his clearly established law, it wouldn't be a harmlessness argument. It would be his burden to show that whatever use there was of the proffer was material, because in United States v. Bagley, the court talks about all those cases— was adamant at the new trial hearing that the proffer was inadmissible under 410. Correct. That's why he said it shouldn't even go in the appellate record. We don't have it. Correct. So are you or are you not arguing that his question to the father, the government witness at the guilt phase, is proper? In other words, you say to your witness, did he ever confess, but you've gotten a proffer from his attorney admitting to all the facts of the crime. It seems to me Felkman would have understood that that's an improper question. Separate issue is penalty phase responsive use. Right. Well, his question—so his question, he never confessed, first of all, that doesn't go directly to the proffer, I don't think. Or at least it doesn't go to the part of the proffer that they are basing their due process claim on. So he said—the context of that, as Your Honor knows, is that Kent Whitaker, his father, said when he came back from Mexico, he told me, Dad, I'm so sorry. It's all my fault. I'm going to do everything I can to make it right. And at that point, I knew he was guilty and willing to confess. And then Mr. Felkman says, but he never confessed, did he? Now, they want to say that that's all about the proffer. I don't—that's certainly not necessarily true. It is debatable at the very least because what I think it is, if you look at the entire record in Felkman's approach to the case, that's not. But we've got this proffer where he's not remorseful. It's he never confessed. You're up here telling us that's what he wanted to do all along, and he just doesn't do it. So what am I supposed to do with that? And at that point, his father mentions the proffer. Now, it's a similar sequence of events at punishment because there, there's no question that the petitioner raises the proffer first on page 4271 of the record. And later—and Mr. Felkman doesn't follow up with any questions. He comes back later, and he says—and before I move on to that, in his opening argument at the punishment phase, Felkman doesn't refer to the proffer. He says on 4227, you're going to hear about a plea bargain in this case. It's already been brought up. Well, at that point, Mr. McDonald has talked about a plea bargain. All we wanted to do was plead to multiple life sentences. And sure enough, in punishment phase, they heard about a plea bargain. On direct, petitioner said, yes, yes, sir, all I wanted to do was plead as many life sentences as they want. And so he brings up the proffer, and Felkman doesn't return to it for several pages. But then on 4278, he says, okay, well, you also mentioned something about a proffer. He hands it to him, and he says—he doesn't say, that doesn't show any remorse, does it? He says, is that true? And petitioner says, I didn't write that. And Felkman never said—he never gets to the substance on his own. Instead, petitioner volunteers, oh, that's not how I wanted to do it. I wanted to express remorse. There was another one. And then the response by Felkman, it's not based on the substance of the proffer. What he says is, your father is pouring his heart out to me, and I don't see any remorse, any repentance by you. It is far from clear that that is a direct reference to the contents of the proffer. But the defendant responsibly says, I didn't write it, which is an exact reference to the proffer. Once he asks the question, father poured it out, you didn't, everyone understood they were talking about the proffer. The defendant himself says, I didn't write it. Well, the defendant understood that. Yeah, but then Felkman buys into it. He says, that's why it was so insulting to me. He's crying, and you're not. That's when he uses the word insulting. That is correct. I still submit that it is not, it is ambiguous what Felkman is referring to. Because if you look at it in context, this is after he has been found. I would have thought your position in front of us would be 410, federal and state, allows use once he brought it up. That the CCA is right, it was inextricably his entire mitigation defense, so then he could go into it. My difficulty is the single question asked to the father, not brought up in closing argument at the guilt phase. And that's entirely fair. Assuming that he was referring to it, it was not contrary to the rules of evidence. Because he is trying to get something out of something inadmissible. So, yes, the prosecution is entitled to respond. And the way they responded was minimal and very general. They did not say, well, I've got you right here on paper saying I don't care, I have no remorse. I have a couple procedural questions. Texas is usually very vigilant in enforcing procedural bars on federal habeas. But in this case, as I look at the state habeas court's findings on this due process claim, which was characterized as claim six, paragraph 35, which is I think 5261 of the record. Paragraph 35 basically says because, and of course on direct appeal there was the challenge under 402, and the courts as well wasn't contemporaneously objected to. Then on state habeas, it's raised in the form of due process for the first time. And paragraph 35, the state court, which was adopted by the court of criminal appeals, says because this due process argument could have been made on the trial record on direct appeal, it's barred from being raised on habeas. Now, they do then go on in the following paragraphs to also reject it on the merits. But it seems to me that's a procedural bar. But did you anywhere in the district court, federal district court, argue that? We did not. And so does that mean it's waived? It's not necessarily, it does not preclude the court from reaching it. The rule is that the State only waives it if it is intentional and deliberate. And I would submit here that it's not. However, I cannot deny that we did not argue procedural. And there is case law saying at least procedural default is subject to waiver. I mean, waiver is always somewhat discretionary, but it is subject to waiver. That is true. Now, exhaustion, I don't think under AEDPA, I think exhaustion is a statutory prerequisite under AEDPA. So let me ask about exhaustion. On his arguments, you know, Santabella seemed to be what was being argued in the state habeas, even mostly in front of Judge Ellison. Now he's also saying, well, and I think these arguments might have been made in the federal district court, even though Judge Ellison didn't address them. But now he's focusing on Giglio and involuntary statement as sort of variations. Were those at all raised in any state court proceeding, that it was an involuntary statement? I believe that he did. I think he did make a variety of kind of nonspecific arguments in his state habeas petition. So it's not our position that there is an exhaustion problem. Our position is he made his due process claim. It was rejected on the merits, and that's it for AEDPA purposes. We are not relying on exhaustion for that. And to get to Your Honor's point about what the CCA said once it discussed the procedural bar, there's no question that it adjudicated this claim on the merits. And so that means that the question, as I said earlier, is what's the law, and why is the CCA's application of that clearly established principle unreasonable? It can't be Santabella, because Santabella says government, when you enter into a plea agreement and you get the benefit of your bargain, you have to uphold your end. That's not what's going on here. Well, on Santabella, he does cite, and your brief doesn't respond to it, a case from our court from the 1970s, United States v. Ross, that says it applies Santabella not to really a plea bargain, but to the inducement of getting testimony. And it appears to just say pretty straightforward opinion, not much analysis, but it does say Santabella also applies to this situation without thinking it's much of a difficult question. Now, I understand under AEDPA you have to show an unreasonable application of Supreme Court law, but could you address Ross, and if it felt that Santabella applied so straightforwardly in that situation, why isn't that a good case for the Petitioner? Right. Well, at least two reasons. One, as you suggested, it's not a good case because not only do you need a clear statement of Supreme Court law from a holding, but the Supreme Court's been very clear that you can't rely on circuit cases to, quote, sharpen the application of a clearly established rule. The other reason, going directly to Ross, is that in Ross it was, as I recall, it was an interrogation where the defendant said something to the effect of, I'll take all the responsibility if you just let my wife out of it. And then they used that against him at trial to get a conviction. And so that was they were actually using a statement obtained in plea bargain to introduce it at trial. That was to the police. Ross must have come down right before the Federal Rules of Evidence because the statement was made to police, which wouldn't be covered anyway anymore, correct? It was made to the police. Now it's only a statement to an attorney for the government. I'll accept that. And the rule now has the responsive exception, responsive use by the government's appropriate, which didn't yet exist. Under 410. Right. Because 410 didn't exist. Right. Ross. Okay. But our main argument on Ross is that it just doesn't help him, even if it seems like this Court decades ago thought Santabello applied. Because if you look at Santabello, whatever law that clearly establishes, you can't say that the CCA unreasonably applied that in reaching the conclusion it did. What portion, I'm curious, your statement on applying AEDPA, what portion of the habeas affirmance by the CCA do you say resolved the due process issue before us? Because really all the Court does is say we adopt these findings with these exceptions. So which specific finding did they adopt that addressed the due process twist they've got? Sure. Paragraph number would be great. Of course. There are two points. There's finding fact paragraph 109, which says, Applicant fails to prove by a preponderance of evidence his allegations that his rights to due process in a fair trial were violated. And conclusion of law paragraph 34 at ROA 5281, which concludes, and I'm paraphrasing here, references to the proffer to which trial counsel did not object did not result in a due process violation. So those two are sufficient to resolve. Arguably, the second one is the procedural bar that wasn't reiterated to Judge Ellison. Well, the procedural bar, as Judge Costa mentioned, is actually, it's paragraph 35. So it's the next paragraph. All right. Right. I don't want to dwell on the involuntary confession cases because it is our position that that line of cases cannot possibly provide clearly established law for a couple of reasons. It's not his statement. It was not involuntary by any means, and it wasn't used against him as a confession. So happy to answer any questions, but we just don't think that that can possibly be a winner for him. The Brady and Giglio, I mentioned that even if this is not defaulted and even if we accept that Brady and Giglio and that line of cases supply some clearly established rule, part of the rule that they clearly establish is that the evidence in question, it has to be shown to be material in order to support a due process violation. And that means, as the Court said in Bagley, that there has to be a reasonable probability that the result of the proceeding would have been different, meaning a probability sufficient to undermine confidence in the outcome. But Brady and Giglio assume that the government is concealing something. Correct. Here he wrote the item that he's complaining about. Right? So his argument is more of the NAPU line, which is there was a misleading question. Right. It isn't that he, they suppressed evidence that was exculpatory or right? Right. But the materiality and due process analysis is the same for those cases as well. You probably know the facts very well. I noticed the opposing counsel was asked about jury questions. March 7, 2007, I noticed in the record a jury question. What date was the decision made to file this case as a due death penalty case? Wouldn't a fair inference from that be that they're trying to ascertain, did this guy confess as he says he did from day one? Or is Mr. Felkman right that he's a manipulator, he maneuvered always, and he didn't confess, and that proffer we can just assume doesn't contain a confession? In other words, wouldn't that question show maybe the jury was struggling with exactly the dilemma? That is in the record. It's very difficult to know what the jury was thinking when they asked that question. Was that at the penalty phase or the guilt phase? Do you know offhand? March 7? I apologize. I'd be happy to look at it as a follow-up. I don't remember. But I think what we can infer from the jury's question about when the decision was made was it could be several things. It could be one thing it could be is did they make the decision after Petitioner sent the prosecutor a Christmas card? That seemed to be some part of Mr. McDonald's theory that once that happened, there was no possibility of getting a plea deal. So I really just can't do much more than speculate. So as I was saying, if we assume that it is the Napue due process line of cases that governs, he's got a materiality problem. One, because he has not talked about it. But second, the question then becomes could any reasonable jurist, since this claim was rejected on the merits, could they possibly look at the entire record and have any confidence that the jury would have reached the same conclusion if the proffer had never happened and never been mentioned? The answer has to be yes to that question. The defense's theory was all I want to do is confess, accept responsibility. Prosecution's theory, you were manipulative. All you wanted to do was negotiate. You didn't want to accept responsibility. You wanted to avoid the death penalty. The proffer was unnecessary to that theory. It was, to the extent it was any part of it, it was a minuscule part of it. And it's not, it is absolutely clear that the prosecutor could have made exactly the same arguments if the proffer had never been mentioned. He could have said all you're doing is negotiating. You say you want to take responsibility, but it's always I'll give you this if you give me that, which is what he said. The proffer is not a material part of that argument. As I started to mention earlier, if we're talking about manipulation, as you recognize, Judge Higginson, there's plenty, even after the arrest, when supposedly he has had some sort of epiphany, that he's really not ready to accept responsibility. The jail phone call, the Christmas card to the prosecutor, it's bizarre. And perhaps Mr. Felkman overreacted, but when a jury sees that and there's an argument and a well-founded suspicion that this is a very manipulative person, I mean, after all, he did convince three groups of people to not only help him kill his family, but to actually pull the trigger. What are they supposed to think about that? It is impossible, I think, to imagine that having the brief mention of the proffer in this record is what made the difference and having it out would have led to a different result. I want to move on to talk briefly about the ineffective assistance claim where he's seeking a certificate of appealability. It's rejected on the merits by the state court. This is essentially a Wiggins claim, and the CCA ruled against him on both prongs, so he would have to meet ADPA's relitigation bar on each. We don't think he can meet either for the reasons stated in our brief, but very briefly, it's not a typical Wiggins claim. It's not an issue of horrible privation and abuse. The whole argument is Mr. McDonald failed to investigate and then present a defense based on psychological evaluations. I think the most succinct response that I could give is just to refer the court to Mr. McDonald's affidavit, also to refer to the 1997 test by Dr. O'Rourke, which identified paranoid personality disorder, sadistic personality disorder, and narcissistic traits. Yes, it's possible that more could have been provided, but it is not possible under Strickland to conclude that failure to provide more made any difference in the outcome. In fact, I think Mr. McDonald's instinct is probably correct that it only would have been worse. Since that's in the posture of whether we should grant a certificate of appealability, should we wait until the Supreme Court decides the Buck case? Because at the Buck oral argument, who knows what the opinion is going to say, but there was discussion from more than one justice, I believe, that our circuit is doing too much of the work at the COA stage and creating too high a barrier at the COA stage. So given that that opinion might come out soon, is there any benefit to waiting and seeing if that does alter how we're dealing with COAs? I recognize the concern. In this case, no. This case, to the extent that I have some experience with Wiggins' cases, the Strickland analysis here is pretty straightforward and very solid. I think this court is absolutely on a firm foundation to say that reasonable jurists would not disagree that the district court got it right and that the CCA was not unreasonable in applying Strickland, where we have an actual investigation, a reasoned decision based on that investigation that further investigation won't do any good, and a similarly reasoned decision that if I introduced any of this, it would only hurt my client, so I'm going to focus on a totally different mitigation theory, which looks like the most effective theory he could have. And not only that, but his decision... That theory was... That theory was... He was trying to leave from the start. He didn't pull the trigger. The guy who did pull the trigger isn't getting... And then the uncle and the father don't want death. The uncle and the father. I think that is strong, I think. And it's certainly strong enough to say without any question that Mr. McDonald's decision to focus on that and focus on the shooter and the other issues that it was not unreasonable as a matter of law. And not only that... His position is even if Buck were to say we need to be more lenient at the COA stage, this case would not even meet that stage. This is not in the realm of question, Your Honor. That's the State's position. If there are no more questions, I'll cede the rest of my time. Thank you, Mr. Frederick. Rebuttal? Yes, Your Honor. I'll confine my rebuttal to the issues raised about the IAC claim. I think that COA is certainly required in this case. We have a situation where the attorney did not retain a mental health expert even though there were signs in the record that he reviewed, signs identified by Judge Ellison as well, in the very documents that he maintains has led him not to investigate further that shows that he had a seriously mentally ill person dependent on his hand, not to mention the circumstances of the crime. But the more innate these characteristics are, the more the jury can think he is a future danger, etc., that this wasn't an isolated incident. So that's why Judge Ellison says it's a double-edged sword. That kind of testimony is you don't want the jury to think he's so irredeemable that death's the only option to eradicate him as a danger. I mean, that's always the challenge. You know, what side of the coin do you want to play at sentencing? And this trial, the attorney said, no, we're going to try to say he is remorseful, he can be rehabilitated. I'm sorry, I don't see what the double edge is at all. Because if you show he's got all these serious, and this is what Judge Ellison said, if you show he's got all these serious mental conditions that cannot be, for the most part, are difficult or impossible to fix, then the jury's going to think, well, boy, this stuff he did before is going to happen again because this is a serious, innate issue with him. Well, it depends on the mental illness, and it depends on the, in this case, the record shows that he was afflicted with paranoia, delusional beliefs, and a crumbling mental state, according to the report of his psychologist. And the other aspect of it was that these were directed. They're not sort of generalized problems that make him a danger to anyone else. They were directed towards his family.  to explain that to a jury. How else can that be explained to a jury, that this person is not just a general threat? After all, he knew that was coming in through the testimony of Lynn Ayers, who was an educational counselor, who was allowed to testify that he was narcissistic, that she thought she was dangerous. He needed someone to explain to the jury that those traits are not making him a danger to society. But he could have been a danger to his family still. Well, to Kent Whitaker, and I don't... His father was still alive. That's right. But then the jury would have a very narrow population, which he could threaten, and they'd have to see, well, is that even a realistic possibility, that there he is on death row, and he's going to be a danger to his father? How can that be? It changed the picture entirely of the case. Well, his history would indicate that it could be pretty dangerous in terms of his ability to solicit others to do his bidding. That's right. It could be if he was motivated to do that towards any other targets, and that was why you needed a psychologist to explain that. Yes, people can be obsessive. They can have a... And their mental illness can lead them in one direction and target certain people. And that's what happened in this case. The other aspect that I think has been overlooked has to do with the fact that if this decision stands, it essentially allows attorneys to conduct an ostrich defense of their decisions whether to investigate thoroughly. I'm afraid of what I'm going to find. That cannot possibly be a justification. I can understand if it was time, if it were money, if he had read some... said, look, I've canvassed the literature and I've seen that this type of case is not defensible. Was it part of his motivation to truncate this investigation, his belief that anything unfavorable could be used by the state against Mr. Whitaker? That anything that his experts may have discovered could have been used by the state, whether or not he chose to use it. That's correct, and it was completely mistaken. He was, one, retained counsel. There was no need to go to the court and seek funding for a defense expert. He could have retained a consulting expert, and it would never have been discovered. The claim that somehow there was a loophole in the groan that he should have been fearful, I mean, would be allowed the defense attorney to take the most vaporous excuse for not investigating and write me on it. The ineffectiveness claim is aimed at Ardoin, Cogdell, McDonald, and Phillips, all four of them? No, it's just at the trial attorney, Mr. McDonald. For one thing, Mr. Cogdell and Mr. Ardoin did retain Jerome Brown, and he wrote an extremely favorable report in favor that explained pretty much along the same conclusions that Kit Harrison did. In fact, in many ways, it was even more. Doesn't that support McDonald's 12-page affidavit saying, here's what I wanted to do. I wanted to hear the government's case, and then I had three things that I wanted to emphasize. And I didn't want to get distracted, have the jury focus on anything except the uncle's pleading, the father's pleading, and the defendant saying he tried to plead to life. So it's a highly coherent mitigation strategy. Except that he didn't apparently get... But you've said that Cogdell elicited the identical testimony and it was already there. Yes, but he didn't get that report. Right. That's the report that's in the sealed material? No, no. I mean, when you look at his affidavit, he says, I talked to Jerome Brown, and his understanding that there wasn't... There was no mention that there was, in his affidavit, that there was a report that he reviewed and decided that he made his decision upon it. And it indicates that he didn't get that. He didn't do that basic step of getting the prior counsel's file and Dr. Jerome Brown's report. And, in fact, the... When you say it was favorable, did he say that Mr Whitaker was well mentally? No, he did not. And that's why... But for me, favorable mitigation evidence is someone that is suffering from a mental illness. And he did give him an Axis I diagnosis that was similar to the one that... And shows that it was persisting over time, for one thing. And also described him not as a vicious, narcissistic person, but as a pathetic character who needed help. And needed intervention that he didn't get. Both... That seemed to be a universal conclusion of the psychologist. So... And then to address the harm issue, which I have partly. I mean, the issue was, if you're going to put on any of the defenses that he wanted to... Such as, he is truly repentant now, or he is no longer a danger, despite his mental illness, you need someone that can explain that to a jury. And they did not have that in this case. Thank you, Mr. Wright. Thank you, Your Honor. This concludes the Court's consideration of this matter for the day. We will take it under advisement, issue an opinion in due course. We are adjourned.